UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CLEAR WIRELESS, LLC, an Arizona limited liability company,<br><br>                Plaintiff,<br><br>v.<br><br>MOUNTAIN STATE CELLULAR, INC. an Idaho corporation; and GO WIRELESS, INC., a Nevada corporation,<br><br>                Defendants. | Case No. 1:16-cv-0002-CWD<br><br>**MEMORANDUM DECISION AND ORDER RE:**<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. 21); and**<br><br>**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 22)** |

## INTRODUCTION

Pending before the Court are two competing motions, both seeking summary judgment on claims raised in the Complaint. (Dkt. 21, 22.) The Court heard oral argument from the parties on April 11, 2017. After review of the record, consideration of the parties' arguments and relevant legal authorities, and otherwise being fully advised, the Court issues the following memorandum decision and order granting in part and denying in part both motions.

**MEMORANDUM DECISION AND ORDER - 1**

# FACTUAL BACKGROUND[1]

Plaintiff Clear Wireless, LLC ("Clear"), and Defendant Mountain State Cellular, Inc. ("Mountain State"),[2] were sales agents of Verizon Wireless ("Verizon"). Both entities operated several brick and mortar locations selling Verizon phones and service plans. In early November of 2014, Nicasio Jones, owner of Clear, contacted Mountain State's sole shareholder, Mark Urness, regarding the potential sale of Clear to Mountain State. On November 18, 2014, Jones and Urness executed an Asset Purchase Agreement ("APA") for Mountain State's purchase of Clear. (Dkt. 21-7 at 9.)

Due to the entities' status as Verizon agents, they needed Verizon's approval of the sale. Accordingly, they included the following provision within the APA:

> 4.4.2 <u>Verizon Wireless.</u> Verizon Wireless shall have approved in writing and consented to the asset purchase and sale transaction subject to this Agreement, and shall have acknowledged its intent and consent to continue conducting business with the Buyer and the Business.

APA, § 4.4.2 (Dkt. 21-7 at 7). On December 5, 2014, Verizon approved the APA by executing the Verizon Agreements Amendment ("VAA").[3] (Dkt. 21-7 at 47.) The VAA amended both Mountain State's and Clear's independent agent agreements with Verizon.

---

[1] The following facts are undisputed unless indicated otherwise.

[2] Mountain State did business as "Mybullfrog." On June 1, 2015, Mountain State dissolved/merged into Go Wireless, LLC. To avoid confusion, given the two agreements upon which the breach of contract claims are based reference the entity Mountain State and not Go Wireless, the Court will refer to Defendants in this order as Mountain State.

[3] Plaintiff refers to this agreement as the "Verizon 3-Way Agreement." As explained more fully below, the VAA is one document that amends independent agency agreements: (1) the agency agreement between Verizon and Mountain State; and (2) the agency agreement between Verizon and Clear.

In addition, pursuant to the provisions in the VAA, Mountain State assumed specific rights and obligations from Clear.

The crux of this litigation relates to two alleged instances of breach of contract by Mountain State regarding the terms of the APA and VAA. To better understand the parties' arguments, the Court will outline briefly the parties' agency relationships with Verizon and the pertinent provisions of the VAA[4] and APA.

## I.    Agent Relationship with Verizon

Verizon agents purchase handset devices (i.e., cell phones and tablets) directly through Verizon and the costs of those devices are charged to the agent's individual Equipment Dymax Account, a system of accounting used by Verizon that allows its agents to order handset devices on credit. Dec. Urness, p. 57, ll 15-19 (Dkt. 26-2 at 67). Each agent has a maximum credit allowance with Verizon and, depending on what the agent orders during a given month, the agent must make monthly payments toward its Dymax Account balance. *Id.* at p. 58, ll 2-4. "Iconic Devices" are devices a Verizon agent does not have in stock and has to order for its customer, for example, newly released Apple or Samsung devices. (Dkt. 21-4 at 8). Iconic devices, like any other handset device, are ordered through the agent's Dymax Account. (Dkt. 21-4 at 6.)

When an agent sells a handset device and Verizon service plan to a customer, the customer pays the agent for the device and will pay Verizon for the service plan. If a

---

[4] Although the APA was executed before the VAA, to better understand the contractual relationship between the parties and how the two contracts relate, the Court will discuss the terms of the VAA before discussing the APA.

customer finances the purchase of the device, Verizon buys the financing plan from the agent.

A central aspect to the agency relationship with Verizon is how Verizon pays its agents for the sale of handset devices and service plans. The commissions for these transactions are paid by Verizon to its agents approximately one month after activation of the service plan and consists of two components: (1) reimbursement for the expense of the handset device; and (2) the true commission for the sale of the service plan.[5] Pursuant to the agent's agreement with Verizon, to retain the commission Verizon pays on a new customer account with Verizon, the customer's account must remain active and payments current for a period of time, generally 180 days. If a customer cancels his or her service plan or fails to pay Verizon, Verizon will chargeback the full commission against the sales agent.

Verizon provides also financial incentives to its sales agents to open new stores through a program called Market Development Funds ("MDFs"). This program works as follows. Verizon identifies a location where they want to open a store and reaches out to an agent who is interested in opening a new location. (Dkt. 26-2 at 10.) To entice the agent into opening the new store, Verizon offers the agent money, MDFs, to use to promote the new store. The amount of MDFs paid by Verizon to its agent is based upon what Verizon anticipates the store's annual sales will be. If the new store location does

---

[5] For example, if an agent purchases an iPhone for $949 through its Dymax account. Verizon directs its agent to sell that phone to the customer for $200 if they activate on a two-year service plan (the remainder of the device to be financed). When the service plan is activated, Verizon pays a commission payment to the agent consisting of: $749 (the remainder expense owed on the phone) + $200 (for the actual commission for activating the service plan). *See* Clear 30(b)(6) Depo., at p. 147-148 (Dkt. 26-2 at 42).

not meet defined sales goals during its start-up period (usually 18 months), Verizon will chargeback a prorated portion of the MDFs it paid to the agent.

## II.    Verizon Agreements Amendment

Verizon provided its written approval and consent to the APA by executing the VAA on December 5, 2014. (Dkt. 21-7 at 47.) Essentially, the VAA is one document that amends two independent agent agreements: (1) the Verizon agent agreement between Verizon and Mountain State; and (2) the Verizon agent agreement between Verizon and Clear.[6] The intent of the parties is expressed in the VAA as follows:

> (i) transfer the Clear Locations as approved Locations to [Mountain State]; (ii) assign the Clear Customer Base and Clear [Customer Base Account Maintenance Fees ("CB AMF")] to [Mountain State]; (iii) retain responsibility for the Clear Dymax Debt payment obligations to [Verizon]; (iv) and transfer of Clear's [Marked Development Fund ("MDF")] risk to [Mountain State]; and (v) terminate the Clear Agreement as of midnight of the day prior to the Amendment Effective Date ….

VAA, Recitals (Dkt. 21-7 at 48).

Pursuant to the terms of the VAA, Mountain State assumed specific rights and obligations from Clear, including liabilities for chargebacks for customer deactivations and cancellations and MDFs. Specifically, regarding customer deactivations and cancellations, the VAA provides:

---

[6] Specifically, the lengthy title of the VAA is as follows:

> The Amendment to (1) Verizon Wireless Agent Agreement Between Verizon Wireless and Mountain State Cellular, Inc. d/b/a Mybullfrog.com Regarding the Addition of Agent Locations and Assignment of Subscriber Base; (2) Verizon Wireless Agent Agreement Between Verizon Wireless and Clear Wireless, LLC Regarding the Termination of Said Agreement and Payment of Equipment Debt and Other Obligations.

VAA, at 1 (Dkt. 21-7 at 48).

**MEMORANDUM DECISION AND ORDER - 5**

[Mountain State] and Clear hereby agree, acknowledge, confirm and ratify that the rights and obligations with regard to the Clear Customer Base and the Clear CB AMF are assigned by Clear to [Mountain State] and are assumed from Clear by [Mountain State], effective as of the Amendment Effective Date, including but not limited to all Chargebacks and other offsets applicable to the Clear CB AMF paid or payable on the Clear Customer Base assigned and assumed hereunder, [Verizon] hereby consents to such assignment and assumption and, unless expressly stated herein, releases Clear from its obligations under the Clear Agreement for the Clear Customer Base. All terms and conditions of the [Mountain State] Agreement will apply to the Clear Customer Base, including without limitation (i) the payment of AMF thereon at the rate set forth in Section D.3., below, and (ii) the customer service obligations set forth therein. …

VAA, § D (Dkt. 21-7 at 50). Regarding transfer of Clear's MDF risk, the VAA provides:

E. Transfer of Clear MDF Risk to [Mountain State].

1. For the four (4) Clear Locations identified below, [Verizon] previously paid to Clear MDF in the amount of $35,000 for each Location. [Mountain State] agrees to accept potential deduction/ recoupment risks of these MDF monies, as follows. [Mountain State] agrees that in order to avoid a deduction/recoupment of all or a portion of the $35,000 for each Clear Location, it assumes the obligation that Clear undertook to achieve or exceed sales of 1,800 Gross Activations … during a defined 18-month Period …

2. If [Mountain State] does not achieve the above Minimum Attainment Level at one or more of the above Clear Locations, then any deduction/recoupment of monies for each Clear Location shall be done pursuant to the MDF terms and conditions in Exhibit B of the [Mountain State] Agent Agreement.

VAA, § E (Dkt. 21-7 at 50).

As a result of the VAA, Clear's agent agreement with Verizon was terminated as of December 5, 2014. Essentially, the above VAA provisions permitted Verizon to apply chargebacks for customer deactivations and MDFs that originated from Clear's business against Mountain State's commission account. With regard to Clear's Dymax Account

balance, Clear agreed to "zero-out" its account prior to the termination of its agent agreement with Verizon, which it did on November 28, 2014.

Pursuant to the VAA, Verizon applied chargebacks against Mountain State commissions in the amount of $55,553.47, for customer deactivations or cancellations of service plans that originated from Clear stores prior to closing.[7] Specifically, these customers had activated their accounts through Clear prior to closing on December 1, 2014, and Clear was paid a commission on these activations. These deactivations and cancelations occurred and were applied by Verizon for the six months of December 2014 through May 2015. In addition, after closing, Verizon applied two chargebacks against Mountain State related to MDFs accepted by two of Clear's locations in the amounts of $17,500.00 and $4,919.00. The total amount of Verizon chargebacks for customer deactivations and cancellations and MDFs was $77,972.47.

### III.    Asset Purchase Agreement

On December 1, 2014, Clear and Mountain State closed on Mountain State's purchase of Clear's business. Both Clear and Mountain State agree the APA is a valid and enforceable contract.

Pursuant to the APA, Mountain State agreed to purchase Clear for $2,500,00.00, plus the value of new and marketable inventory. The parties agreed Mountain State would structure its payments to Clear pursuant to the following schedule:

---

[7] Verizon is not a party to this action and has not alleged any breach of the VAA.

| | |
|---|---|
| Prepayment on November 28, 2014 | **$500,000.00** |
| Due at closing, December 1, 2014 (less inventory) | **$1,500,000.00** |
| *Due June 1, 2015 | **$500,00.00** |
| *Due December 1, 2015 | **$500,000.00** |

*Mountain State Cellular, Inc. corporately guarantees all remaining amounts due. A 5% annual interest rate on funds not paid at closing….

APA, Schedule 1.1 (Dkt. 21-7 at 29).

Mountain State paid $1,500,000.00 to Clear on or before the December 1, 2014 closing date. (Dkt. 21-8.) Mountain State made an inventory payment to Clear on December 3, 2014, in the amount of $396,000.00. (*Id.*) On June 1, 2015, Mountain State paid Clear $394,832.32. (Dkt. 21-8 at 6, 19.) The June 1, 2015 payment consisted of the scheduled payment due of $500,000.00 plus interest of $24,931.51 and less: $74,235.97[8] for Verizon chargebacks and $55,863.22 for inventory "true-up," which included credit for iconic device gross profit.

The issues in dispute relate to whether Mountain State was permitted, pursuant to the APA, to offset chargebacks from its June 1, 2015 payment to Clear and whether Mountain State was permitted to set-off from the same payment its inventory reconciliation.[9] The parties dispute also whether the June 1, 2015 payment included full payment for iconic devices.

---

[8] With regard to Verizon chargebacks for MDFs, Mountain State removed 3/18[th] of the chargeback amount and reduced the offset by $3,736.50. At the time of the APA closing date, two Clear stores were in month 15 of the 18-month start-up period. As such, Mountain State took responsibility of a portion of the MDFs.

[9] The parties do not dispute the accuracy of the calculations of the offset and set-off amounts.

**MEMORANDUM DECISION AND ORDER - 8**

## 1. Verizon Wireless Chargebacks

The APA expressly identifies "Customer Returns" and "Verizon Wireless Chargebacks" as "Seller's Retained Liabilities." APA, § 2.12 (Dkt. 21-7 at 12). With respect to "Customer Returns" the APA provides:

> 2.12.4 <u>Customer Returns</u>. All of Seller's Customer's returned goods and services including, without limitation, cellular telephone units, cellular telephone service contracts cancellations, and related cellular telephone merchandise, goods, accessories and equipment arising out of or in connection with Seller's ownership, possession, operation and management of the Business prior to through closing-; and as more particularly provided in paragraph 2.12.7 below, Seller shall be liable for one hundred percent (100%) of all Verizon Wireless chargeback costs and risk incurred by seller and arising out of or in connection with Seller's ownership, possession, operation and management of the Business prior to and through closing.

(*Id.* at 13.) With regard to "Verizon Wireless Chargebacks," the APA provides:

> 2.12.7 <u>Verizon Wireless Chargebacks</u>. Seller shall be liable for one hundred percent (100%) of all Verizon Wireless chargeback costs and risk incurred by Seller and arising out of or in connection with Seller's ownership, possession, operation and management of the Business prior to and through closing date -. All chargeback costs shall be documented and invoiced from Buyer to Seller and paid by Seller, at the rate of one hundred percent (100%), to Buyer within ten (10) business days of Seller's receipt of such invoice. Buyer shall be entitled to offset the amount of any invoice for Verizon Wireless chargeback costs not paid by Seller within ten (10) days against payment of the Purchase Price.

(*Id.*)

## 2. Inventory

Pursuant to the APA, Mountain State agreed to purchase Clear's new, current, and marketable Verizon phone units and accessory inventory as of the December 1, 2014 closing date. Specifically, "Article 2 Transfer of Assets" of the APA provides:

> 2.4 <u>Inventory</u>. Buyer will purchase from Seller at pricing commensurate with—current Indirect Pricing, all new, current and marketable Verizon Wireless cellular telephone units, merchandise, goods, equipment & accessories for future sale, in the ordinary course of business – on the closing date of December 1, 2014 or earlier.

APA, § 2.4 (Dkt. 21-7 at 11). Pursuant to the APA, "Inventory" did not include certain

"Obsolete Inventory; Returned and Warranty Items:"

> 2.12.8 <u>Obsolete Inventory; Returned and Warranty Items</u>. All obsolete, defective or returned inventory owned by Seller prior to closing date shall be identified and separated from current marketable inventory….

APA, § 2.12.8 (Dkt. 21-7 at 14).

"Article 3—Purchase Price and Additional Consideration" of the APA set forth a

process for valuing Clear's current and marketable inventory:

> 3.2 <u>Inventory</u>. Subject to the provisions of paragraphs 2.12.6 and 1.12.7 above, all phone & accessory inventory will be deemed marketable & appropriate by buyer & shall be preliminarily valued cooperatively between Buyer and Seller within 3 business days prior to closing. After closing and within 3 business days thereafter, Buyer will pay Seller for all inventory, separate from purchase price above.

APA, § 3.2 (Dkt. 21-7 at 14). In addition, the APA included a representation and

warranty from Clear to Mountain State that:

> 12.1.16 All Due Diligence Materials and other data and information regarding the Business provided by Seller and disclosed to Buyer shall be and is certified and confirmed by Seller to be true, accurate and correct, without exception, as of the Effective Date and as of the Closing Date.

APA, § 12.1.16 (Dkt. 21-7 at 22).

And, Schedule 1.1 of the APA, under the headline "Inventory payment" provides the following:

> Total amount of payment to CLEAR Wireless is based on purchase of current and saleable items in store or en route at current market price as of the closing date.

> Total purchase price for Seller for CLEAR Wireless assets and amount paid for purchase of inventory will be applied first and immediately to pay all Verizon Wireless DYMAX debt, then any debt secured by assets or cash flow of Clear Wireless.

> Pricing of serialized inventory to be determined by Buyer with agreement of Seller, and will be consistent with most current Indirect Pricing.

APA, Schedule 1.1 (Dkt. 21-7 at 29).

The President of Mountain State, Urness, acknowledged it was Mountain State's responsibility to determine the marketability of Clear's in-stock inventory. Mountain State 30(b)(6) Depo., p. 155-156 (Dkt. 26-2 at 92). On or about November 18, 2014, Clear provided administrative access by Mountain State to Clear's electronic point of sale system so Mountain State could begin to evaluate the in-stock inventory at Clear's seven locations. (*Id.* at 21.) The accuracy of inventory in an agent's point of sale system is dependent upon its operator, the Verizon agent, to keep the system up to date by eliminating "dead inventory." Because the inventory valuation from the point of sale system is not always reliable, Mountain State needed to verify Clear's inventory as represented in the point of sale system by conducting a physical count in-store. (*Id.* at 84.)

On or about November 30, 2014, Urness and approximately 14 to 18 Mountain State employees travelled to Arizona to do a physical inventory count at Clear's seven

locations. According to Urness, the state of Clear's inventory across its seven store locations was not organized, which made it difficult to sort through and categorize the inventory to determine what was marketable.[10] (*Id.* at 92.) The physical inventory process continued through December 1, 2014; however, Mountain State was unable to complete the task. (*Id.* at 93.) Because most of the brick and mortar locations would continue to operate, Mountain State left in Arizona the marketable inventory that it was able to account for during the physical inventory process. The rest of the inventory was boxed up and shipped to Boise, Idaho, for a final evaluation. It is disputed whether the inventory shipped to Boise included any marketable inventory from any of the store locations in Arizona.

Pursuant to the December 3, 2014 payment deadline for inventory as required by the APA, the parties needed to negotiate a price. On the morning of December 3, 2014, President of Finance and Operations for Mountain State, Matt Jeffries, emailed Jones of Clear the following:

> Just keeping you posted on a couple of items.
>
> Teresa Vander Veen, is our person who is in charge of the inventory and is in your market. She was working on an amount today. It may need trued up but Mark asked her to get a preliminary number done so we can share it with you.

---

[10] Urness provided the following example of the state of Clear's inventory in Mountain State's 30(b)(6) deposition:

> [F]or instance, if there is a thousand of a certain type of [cell phone] case, and if we get there and we find in each store 100 cases in a box, and we can quantify it, then it is fairly simple. When we get there, if there is [sic] a thousand cases strewn amongst seven stores in no particular order, and we have to search them out, now it becomes a significant task. And this is what we found.

(Dkt. 26-2 at 92.)

**MEMORANDUM DECISION AND ORDER - 12**

       ***

Thanks, I will be in touch with you later today Nic.

Dec. Jefferies, Ex. B (Dkt. 21-8 at 11.) Later that morning, Jones responded:

> From my report we showed about $110k in accessory inventory, about $220-240k in handset inventory and about 80k in demo inventory (my understanding after clarification is part of inventory [as opposed to fixtures]) should total about $410k-$430k.
>
> Let me know when it gets finalized on your end.

(*Id.*)

Sometime after Jones sent his message, Jones and Urness had a verbal discussion regarding the inventory payment due that day. (Dkt. 26-2 at 86.) Ultimately, Mountain State offered to pay $396,000.00 (90% of $430,000.00) and wired the payment to Clear. Mountain State notified Clear of its payment via email the same day, stating: "I sent a wire for 396k for the 'preliminary' inventory dollar amount. I know we will have some truing up to do over the next week." (Dkt. 21-8 at 13). At 4:46 p.m., Jones responded: "Received…Thank you!" (*Id.* at 14.)

After reconciliation and ascertaining what value it could for the inventory taken out of the Clear stores and shipped to Boise, Mountain State determined that the total value of all the inventory was $337,484.51.[11] This inventory calculation was $55,863.22 less than what Mountain State paid to Clear for the inventory on December 3, 2014. Therefore, Mountain State set-off $55,863.22 from its scheduled June 1, 2015 payment.[12]

---

[11] Or $340,136.78 if including iconic device gross profit of $2,652.27.

[12] (Original inventory of payment $396,000) – [(True value of inventory $337,484.51) + (credit for iconic device gross profit $2,652.27)] = (Set-off amount $55,863.22)

### 3. Iconic Devices

Pursuant to Schedule 1.1 of the APA, the parties agreed to account for iconic device orders separately from in-stock marketable inventory. Specifically, the APA provides the following regarding iconic device orders:

> Clear Wireless had orders placed for customers with [Verizon] for the purchase of iconic devices, primarily, but not exclusively, Apple iPhone 6 and 6 Plus. It is agreed that the sale, expense and profit from the sale of these devices will remain in favor of Clear Wireless regardless of the date these devices are delivered. All chargebacks are the responsibility of Clear Wireless and will be promptly paid to Buyer within ten (10) business days of written notice.

APA, Schedule 1.1 (Dkt. 21-7 at 30). The process for handling iconic device orders and sales follows:

1. Clear Wireless will provide Buyer with a detailed list of all firm orders placed via [Verizon Wireless's] iconic order portal.

2. As devices arrive, Seller will receive them and inform the customer that the device has arrived. Buyer will make every attempt to finalize each transaction with the customer.

3. Any incidental sales of devices, insurance or accessories will remain in favor of the Buyer.

4. [Verizon Wireless] will charge all equipment (costs of goods) and commissions earned to Buyers [sic] account.

5. Buyer will collect entire purchase price and tax from the customer. In the event the customer pre-paid a deposit with the Seller, only the remaining amount owed from the customer will be collected.

6. At the end of each month all iconic sales will be reconciled and reviewed with Seller for accuracy.

7. All gross profit from all iconic sales will be paid to Seller, less chargebacks and yet to be activated equipment charges, by the 23rd of the month following activation.

8. Buyer is not responsible for customers that do not return to activate equipment they ordered via the iconic portal.

(*Id.*)

Before closing, Clear placed 41 iconic device orders via its Dymax Account with Verizon. Pursuant to the APA, Clear paid off its Dymax Account balance on December 1, 2014. Accordingly, the expenses of these devices (approximately $31,800) were paid by Clear. (Dkt. 26-2 at 44.) As the iconic devices ordered by Clear arrived after the closing date, Mountain State contacted the customers who ordered the devices and worked to finalize each transaction. Mountain State collected the purchase price from the customer and Verizon paid Mountain State for the commissions on these sales.

Mountain State calculated the gross profit of the iconic device orders (i.e., the true commission) as $2,652.27. Mountain State alleges it credited the gross profit of the device orders against the set-off it took from its June 1, 2015 installment purchase payment due Clear per the schedule in the APA.

## STANDARDS OF LAW

### I.    Summary Judgment Standard

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or

defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any material fact – a fact "that may affect the outcome of the case." *Id*. at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id*. at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The Court must be "guided by the substantive evidentiary standards that apply to the case." *Liberty Lobby*, 477 U.S. at 255. If a claim requires clear and convincing evidence, the question on summary judgment is whether a reasonable jury could conclude that clear and convincing evidence supports the claim. *Id*.

When cross-motions for summary judgment are considered, the Court must independently search the record for factual disputes. *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The filing of cross-motions for summary judgment – where both parties essentially assert there are no material factual disputes – does not vitiate the Court's responsibility to determine whether disputes as to material fact exist. *Id*.

**MEMORANDUM DECISION AND ORDER - 16**

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in its favor. *Deveraux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show by "affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex*, 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *So. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

## I.    Breach of Contract

Pursuant to Idaho law, to establish breach of contract, the plaintiff must prove the following: "(a) the existence of the contract, (b) the breach of the contract, (c) the breach caused damages, and (d) the amount of those damages." *Path to Health, LLP v. Long*, 383 P.3d 1220, 1227 (Idaho 2016) (internal citations omitted).

## DISCUSSION

Clear alleges in its Complaint two breach of contract claims. The first claim asserts Mountain State breached the APA by deducting from its June 1, 2015 payment to Clear offsets for Verizon chargebacks and also taking the set-offs for its inventory reconciliation. In addition, Clear alleges Mountain State breached the APA when it failed to provide a separate payment to Clear for iconic devices. The second claim asserts Mountain State breached the VAA by not assuming Clear's liabilities for Verizon chargebacks billed after the closing date.

Both parties filed motions for summary judgment. Mountain State seeks summary judgment on all counts raised in the Complaint. (Dkt. 21.) Clear seeks partial summary judgment on its breach of the VAA claim, and also on its breach of APA claim as it relates to deductions for chargebacks and inventory from Mountain State's June 1, 2015 payment to Clear.

## I.    Breach of Verizon Agreements Amendment

Mountain State contends Clear has failed to demonstrate any breach or damage related to the VAA, because Clear is not a party to Mountain State's agency agreement between it and Verizon. To the contrary, Clear argues it is a party to the VAA, and Mountain State breached the VAA when it "paid itself back" $77,972.47 for the Verizon chargebacks from the June 1, 2015 scheduled payment Mountain State owed to Clear. For the following reasons, the Court finds no breach as a matter of law occurred with respect to the VAA.

Pursuant to the unambiguous terms of the VAA, the VAA is one document that amends two independent agent agreements: (1) the Verizon agent agreement between Verizon and Mountain State; and (2) the Verizon agent agreement between Verizon and Clear. In the paragraph above the recitals, the VAA identified the Verizon and Mountain State agency agreement by Contract Number 707-10606-2009, identified the Verizon and Clear agency agreement by Contract Number WA-0047-2013, and referred to them collectively as the "Agreements." (Dkt. 21-7 at 48.) The VAA expressly indicated that the purpose of the VAA was to amend the "Agreements." (*Id.*) The VAA makes no express reference to the APA between Mountain State and Clear, nor does it purport to amend the APA.

With regard to the VAA's effect on the Verizon-Clear agency agreement, Clear agreed to assign certain liabilities to Mountain State, leaving Clear with no ongoing obligations to Verizon, and Verizon terminated its agency agreement with Clear. *See* VAA, § F (Dkt. 21-7 at 51). With regard to the VAA's effect on the Verizon-Mountain State agency agreement, Mountain State agreed to assume liabilities for Clear's chargebacks for customer deactivations and cancellations and MDFs. Specifically, with regard to customer deactivation chargebacks, the VAA provides:

> [Mountain State] and Clear hereby agree, acknowledge, confirm and ratify that the rights and obligations with regard to the Clear Customer Base and the Clear CB AMV are assigned by Clear to [Mountain State] and are assumed from Clear to [Mountain State], effective as of the Amendment Effective Date, including but not limited to all Chargebacks and other offsets applicable to the Clear CB AMV paid or payable on the Clear Customer Base assigned and assumed hereunder.

VAA, § D.1 (Dkt. 21-7 at 50). And, with regard to MDFs, the VAA provides:

For the four (4) Clear Locations identified below, [Verizon] previously paid to Clear MDF in the amount of $35,000 for each Location. [Mountain State] agrees to accept potential deduction/recoupment risks of these MDF monies, as follows. [Mountain States] agrees that in order to avoid a deduction/recoupment of all or a portion of the $35,000 for each Clear Location, it assumes the obligation that Clear undertook to achieve or exceed sales of 1,800 Gross Activations and/or Upgrades of Postpay Service….

VAA, § E.1 (Dkt. 21-7 at 50-51).

The parties agree that these paragraphs allowed Verizon to apply chargebacks for customer deactivations and MDFs that originated from Clear against Mountain State's commission account with Verizon. The total amount of these chargebacks from Mountain State's commissions was $74,235.97. Mountain State fulfilled its obligation pursuant to the VAA and incurred the costs of the chargebacks when Verizon reduced its commissions to Mountain State accordingly. Mountain State offset the costs of these chargebacks against the June 1, 2015 scheduled installment purchase price payment owed to Clear. Although this is the action Clear alleges constituted a breach of the VAA, Clear's claim is flawed.

Clear has failed to establish a genuine issue of fact with regard to breach of the VAA. The VAA, in effect, constituted Verizon's approval of the buy-sell agreement between Mountain State and Clear as it related to Verizon's ongoing relationship with Mountain State and the termination of its relationship with Clear. To terminate its agency agreement with Clear, Verizon needed to ensure someone was on the hook for the outstanding liabilities Clear otherwise owed to Verizon. As such, Mountain State agreed with Verizon to assume Clear's chargeback liabilities—Mountain State upheld its bargain with Verizon by incurring the costs of the chargebacks when Verizon reduced its

**MEMORANDUM DECISION AND ORDER - 20**

commission. The VAA neither permitted nor precluded Mountain State and Clear from entering into a separate agreement that provided for Mountain State to recoup from Clear the chargeback liabilities it assumed under the terms of the VAA. Accordingly, no breach of the VAA occurred in this regard.

## II.    Breach of Asset Purchase Agreement (APA)

Clear alleges three breaches of the APA. First, Clear contends Mountain State breached the APA by offsetting Verizon chargebacks from the June 1, 2015 installment purchase payment. Second, Clear contends Mountain State breached the APA by applying a unilateral set-off when it made reductions for the true value of inventory from this June 1, 2015 payment. Last, Clear alleges Mountain State breached the APA by not providing a separate payment for iconic devices.

Mountain State contends the offset for Verizon chargebacks is expressly permitted by the APA, and thus does not constitute a breach. Mountain State contends further the set-off for inventory discrepancies is equitable and permitted by Idaho law. With regard to iconic devices, Mountain State admits it did not follow the payment process pursuant to the APA; however, Mountain State contends Clear can prove no damages for iconic devices because Mountain State credited Clear for iconic device gross profit in its inventory reconciliation. Clear disagrees on all fronts. The Court will set forth contract interpretation principles before addressing the chargeback offset, the set-off for inventory reconciliation, and iconic device discrepancies separately below.

### A. Contract Interpretation

When interpreting a written contract pursuant to Idaho law, the Court must begin with the language in the document. *Potlatch Educ. Ass'n v. Potlatch Sch. Dist. No. 285*, 226 P.3d 1277, 1280 (Idaho 2010). "In the absence of ambiguity, the document must be construed in its plain, ordinary and proper sense, according to the meaning derived from the plain wording of the instrument." *Id.* (citing *C & G, Inc. v. Rule,* 25 P.3d 76, 78 (Idaho 2001). "A contract term is ambiguous when there are two different reasonable interpretations or the language is nonsensical. Whether a contract is ambiguous is a question of law, but interpreting an ambiguous term is an issue of fact." *Id.*

"Parol evidence may be considered to aid a trial court in determining the intent of the drafter of a document if an ambiguity exists." *Steel Farms, Inc. v. Croft & Reed, Inc.*, 297 P.3d 222, 229 (Idaho 2012) (citing *In re Estate of Kirk,* 907 P.2d 794, 801 (Idaho 1995)). "If a written contract is complete upon its face and unambiguous, and no party alleges any fraud or mistake, 'extrinsic evidence of prior or contemporaneous negotiations or conversations is not admissible to contradict, vary, alter, add to, or detract from the terms of the contract.'" *City of Meridian v. Petra Inc.*, 299 P.3d 232, 242 (Idaho 2013) (citing *Howard v. Perry,* 106 P.3d 465, 467 (Idaho 2005)).

### B. Offset of Chargebacks

Mountain State contends the APA expressly provides that Clear is responsible for Verizon chargebacks against Mountain State that arose from Clear's business "prior to and through" the December 1, 2014 closing date. Mountain State argues this responsibility included chargebacks related to services provided and MDFs accepted by

Clear before the closing date, but issued by Verizon after the closing date. To the contrary, Clear contends the language of the APA limited the timeframe of Clear's retained liabilities arising from commissions and MDF chargebacks issued by Verizon prior to and through closing, but not after closing. For the following reasons, the Court finds Clear's liabilities under the APA extend to chargebacks issued after the closing date.

The APA provides the following regarding chargebacks:

> 2.12.7 <u>Verizon Wireless Chargebacks</u>. [Clear] shall be liable for one hundred percent (100%) of all Verizon Wireless chargeback costs and risk incurred by [Clear] and arising out of or in connection with [Clear's] ownership, possession, operation and management of the Business prior to and through closing date -. All chargeback costs shall be documented and invoiced from [Mountain State] to [Clear] and paid by [Clear], at the rate of one hundred percent (100%), to [Mountain State] within ten (10) business days of [Clear's] receipt of such invoice. [Mountain State] shall be entitled to offset the amount of any invoice for Verizon Wireless chargeback costs not paid by [Clear] within ten (10) days against payment of the Purchase Price.

(Dkt. 21-7 at 7.)

The Court has reviewed the plain language of the APA and Clear's retained liability as it relates to Verizon chargebacks and finds the language unambiguous. There are two critical aspects to Section 2.12.7 of the APA: (1) the substance of Clear's retained liability; and (2) the temporal aspect related to the liability.

With regard to the substance of Clear's retained liability, Section 2.12.7 of the APA indicates that Clear is one hundred percent liable for chargeback costs and chargeback risks incurred by Clear. Costs and risks are distinct liabilities. The plain meaning of "cost" is "the amount paid or charged for something." *Cost*, Black's Law

Dictionary (10th ed. 2014). Thus, Clear retained one hundred percent liability for chargeback invoices issued by Verizon for sales made by Clear before closing.

The plain meaning of risk is: "the uncertainty of a result, happening, or loss; the chance of injury, damage, or loss; esp., the existence and extent of the possibility of harm," or "liability for injury, damage, or loss if it occurs." *Risk*, Black's Law Dictionary (10th ed. 2014). Each time a Verizon agent activates a new service contract and is paid for the commission of the sale, there is a possibility the customer may default or cancel their plan and, thus, a risk that Verizon will chargeback the commission if a cancellation or default occurs within 180 days of activation. Likewise, when a Verizon agent accepts MDFs from Verizon, there is a possibility the agent will not establish set sales goals and, thus, a risk that Verizon will chargeback a prorated portion of the MDFs it advanced to its agent. Accordingly, Clear retained one hundred percent liability for chargebacks that Verizon could issue later if customers cancelled service plans or if store sales goals were not met.

With regard to the temporal aspect of Clear's retained liability, Section 2.12.7 of the APA indicates Clear is liable for chargeback costs and risks "***incurred*** by Seller and arising out of or in connection with Seller's ownership, possession, operation and management of the Business ***prior to and through closing date***." The "prior to and through closing date" language relates to when Clear incurred the chargeback costs and risk from Verizon. The word "incur" is a verb, meaning, "[t]o suffer or bring on oneself (a liability or expense)." *Incur*, Black's Law Dictionary (10th ed. 2014). Clear incurred a chargeback "cost" when Verizon issued an invoice to Clear. Clear incurred a chargeback

"risk" when it activated a service plan for a Verizon customer or accepted MDFs from Verizon.

Clear contends that, had the parties intended for chargebacks occurring after closing to be Clear's responsibility, Section 2.12.7 would have used forward looking language to otherwise extend its liability into the future. The Court finds this argument unconvincing. Had Section 2.12.7 read that Clear retained liability for only chargeback costs, then Clear's argument might be viable. Costs were the debts and liabilities known to Clear before the closing date.[13] However, Section 2.12.7 indicates Clear retained liability also of the chargeback risk. The risk, although present from the inception of Clear's acceptance of MDFs or activation of customer service plans, was the possibility of debts and liabilities yet to occur or that may never occur. The use of the word "risk" in Section 2.12.7 inherently implies Clear would retain liability that extended beyond the closing date and into the future.[14] It is undisputed that the chargebacks at issue arose from Clear's activation of service plans and acceptance of MDFs from Verizon prior to the closing date.

Moreover, with regard to the right to offset, the Court finds Section 2.12.7 expressly and unambiguously permits Mountain State to offset the amount of chargebacks invoiced by Verizon. Specifically, the provision directed Mountain State to

---

[13] For example, if Verizon charged-back a commission to Mountain State, designated with a date of December 1, 2014 or earlier, Mountain State could request that Clear pay that cost.

[14] Clear's retained liability for chargeback risk was not indefinite. The risk for commission chargebacks extended only 180 days into the future. Likewise, the risk for MDF chargebacks extended through the specified start-up period (there was about 3 months of the startup period left at the time of closing for two of the former Clear locations). Interestingly, the next installment purchase payment after the closing date was due exactly 180 days out.

document and invoice all chargeback costs to Clear, and if Clear did not pay within ten business days, Mountain State was "entitled to offset the amount of any invoice…against payment of the Purchase Price." Pursuant to the above provisions, Mountain State offset from its June 1, 2015 payment to Clear, $74,235.97 for chargebacks issued by Verizon against Mountain State over 180 days after closing. The amount of chargebacks is not disputed by the parties.

As discussed above, the Court finds no genuine issue of fact with regard to the whether Mountain State was permitted to offset $74,235.97 of Verizon chargebacks against its June 1, 2015 installment purchase payment to Clear.

### C. Set-off for Inventory True-Up

Clear contends Mountain State breached the APA when it deducted $55,863.22 from its June 1, 2015 scheduled payment to Clear to account for inventory reconciliation. In support of its argument, Clear argues the language in the APA does not expressly permit any reduction for inventory reconciliation. Mountain State contends the reduction was permitted because Clear violated the due diligence provision of the APA when Clear represented to Mountain State the value of its inventory without first deducting obsolete inventory. Mountain State argues that, pursuant to Idaho law, it was permitted to equitably set-off the inventory overpayment from its June 1, 2015 installment purchase payment to Clear.

The Court finds Mountain State breached the APA when it unilaterally deducted $55,863.22 from June 1, 2015 scheduled payment to Clear, as the APA does not expressly permit such a deduction for inventory. But, the inquiry or analysis does not stop

here, as Clear must prove damages. As discussed more fully below, genuine issues of material facts remain as to whether the December 3, 2014 inventory payment was final, whether the December 3, 2014 payment was for marketable inventory only or for all inventory, and whether Mountain State is entitled to a set-off to reflect the true value of the inventory it purchased from Clear.

"If the terms used in the contract are ambiguous, then the court may turn to extrinsic evidence of the contracting parties' intent to define the terms. For a term to be ambiguous, there must be at least two different reasonable interpretations of the term or the language is nonsensical." *Erickson v. ING Life Ins. & Annuity, Co.*, No. CV09-204-S-EJL, 2011 WL 6056902, at *6 (D. Idaho Dec. 6, 2011) (citing *Armstrong v. Farmers Ins. Co. of Idaho,* 139 P.3d 737 (Idaho 2006)). "There are two types of ambiguity, patent and latent. A patent ambiguity is an ambiguity clear from the face of the instrument in question." *Knipe Land Co. v. Robertson*, 259 P.3d 595, 601 (Idaho 2011). "A latent ambiguity exists where an instrument is clear on its face, but loses that clarity when applied to the facts as they exist." *Id.* "Although parol evidence generally cannot be submitted to contradict, vary, add or subtract from the terms of a written agreement that is deemed unambiguous on its face, there is an exception to this general rule where a latent ambiguity appears." *Id.* "Whether a contract is ambiguous is a question of law, but interpreting an ambiguous term is an issue of fact." *Erickson*, No. CV09-204-S-EJL, 2011 WL 6056902, at *7 (D. Idaho Dec. 6, 2011) (citing *Knipe*, 259 P.3d at 601).

The APA provides the following regarding inventory:

3.2 <u>Inventory</u>…. [A]ll phone & accessory inventory will be deemed marketable & appropriate by buyer & shall be preliminarily valued cooperatively between Buyer and Seller within 3 business days prior to closing. After closing and within 3 business days thereafter, Buyer will pay Seller for all inventory, separate from purchase price above.

The Court has reviewed Section 3.2 and finds its language is latently ambiguous. Specifically, ambiguity exists regarding how the parties extrapolate from the preliminary valuation of ***marketable inventory*** to the payment for ***all inventory*** due three days after closing. Ambiguities exist as to whether the payment was final and what type of inventory (marketable or all inventory) the December 3, 2014 payment included. If the December payment was not final or if did not include all inventory, the APA does not indicate how the parties are to account for these additional payments. Accordingly, the Court will consider the extrinsic evidence of the parties' intent when the APA was negotiated to determine how the parties intended the inventory to be valued.

According to Clear owner Jones, he recalls from pre APA oral negotiations with Urness, that Urness explained there could be up to three inventory payments made to Clear. Describing each category of inventory as a "bucket," Jones explained during Clear's 30(b)(6) deposition the process in which he understood inventory was to be valued:

The first bucket would be the things that [Mountain State] would keep in stores, those are current and marketable inventory. [Urness] said [Mountain State] would value that, and [Mountain State] would make [Clear] that payment on or about December 3rd; that's where the $396,000 payment came from.

> [E]verything outside [what is deemed marketable] would be put in bucket 2, where [Mountain State] would take back to Boise and [Mountain State] would try to sell it [to] third-part[ies] through other small retailers…. [The] money from [bucket 2] would go directly to [Clear] in a second inventory payment.

> [A]nything that couldn't be sold would be put in bucket 3. And that bucket 3 would - - [Mountain State] would part it, they would piece it, they would throw it away, I don't know what they would do with it, but if there was any value to it, [any income on those items] would also be sent to [Clear] as a [third] payment.

(Dkt. 26-2 at 21.) According to Jones, the $396,000 payment on December 3, 2014, was payment for marketable inventory and that payment was final, i.e., not open to further negotiation or deduction. He understood Clear could get up to two additional payments from Mountain State for inventory (per buckets 2 and 3).

According to Urness's 30(b)(6) deposition testimony on behalf of Mountain State, he confirmed that he had described the inventory categorization process to Jones in terms of "buckets." However, Urness's understanding of Mountain State's payments for inventory to Clear was quite different than described by Jones. Urness contends that, during the conversation he had with Jones on December 3, 2014, Urness verbally asked Jones if $396,000 for inventory would be an acceptable payment "for now." Urness contends he explained to Jones that Mountain State would take the yet-to-be valued inventory back to Boise "and really give it our full attention and make sure that we got [Clear] full market value." (Dkt. 26-2 at 83.) Urness explained that it was Mountain State's intent when singing the APA to:

> [C]ome up with as accurate a number [for marketable inventory] as possible [by December 3, 2014] so that Nic could be mostly whole on the inventory and did not have to cover any material amount of inventory costs while we went through the reconciliation process.

(Dkt. 26-2 at 82.)

When Mountain State wired the December 3, 2014 inventory payment to Clear, Mountain State notified Clear of it payment via email "I sent a wire for 396k for the 'preliminary' inventory dollar amount. I know we will have some truing up to do over the next week." Dec. Jefferies, Ex. B (Dkt. 21-8 at 13). At 4:46 p.m., Jones responded: "Received…Thank you!" (Dkt. 21-8 at 14.)

Upon consideration of the above, the Court finds the intent of the parties regarding the finality and the type of inventory the December 3, 2014 encompassed (marketable or for all inventory (including iconic devices)) are disputed issues of material facts which precludes summary judgment on this claim. The finder of fact could find that the intent of the parties was for Mountain State to make up to three inventory payments, and the first payment on December 3, 2014 was a non-negotiable payment for current and marketable inventory. On the other hand, the finder of fact could conclude that the December 3, 2014 payment was intended as a placeholder payment to be adjusted later once Mountain State was able to value all of Clear's inventory.

Likewise, genuine issues of material fact remain as to Mountain State's affirmative defense that it is entitled to a set-off to account for the true value of the inventory it purchased from Clear. According to the Idaho Supreme Court, "the right of setoff exists except where denied or limited." *Dawson v. Eldredge*, 8405 P.2d 754, 758

(Idaho 1965) (citing *Brown v. Porter*, 245 P. 398, 398 (Idaho 1926)). The Idaho Code does not limit or deny a defendant from asserting an affirmative defense for set-off in a breach of contract action. Equitable set-off "is based on the principle that where two parties are mutually indebted, justice requires that the debts be set off and that only the balance is recoverable." *Int'l Equip. Serv., Inc. v. Pocatello Indus. Park Co.*, 695 P.2d 1255, 1258 (Idaho 1985) (citing 20 Am. Jur. 2d *Counterclaim, Recoupment, and Set Off* § 7 (1965)).

As indicated above, genuine issues of material fact exist as to whether the parties are mutually indebted to each other. If the December 3, 2014 payment for inventory was not intended to be the final transaction for all inventory between the parties, Mountain State may be entitled to a set-off.

### D. Iconic Devices

Mountain State contends that, pursuant to the "Iconic Order Agreement" in Schedule 1.1 of the APA, it owed Clear a payment for iconic device gross profit (i.e., not the entire commission from Verizon covering the expense of the handset device). Mountain State admits it breached the APA by not processing its obligation for iconic devices separately from the other inventory; however, it contends no damage occurred to Clear because Mountain State credited to Clear in its inventory reconciliation reduction the gross profit for iconic devices. Clear argues that, due to Mountain State's failure to separately process iconic devices, this breach resulted in "a severe underpayment to Clear." Clear contends it was entitled to the full Verizon commission, which included reimbursement for the expense of the devices, of which Clear paid in full when it paid off

its Dymax account at closing. For the following reasons, the Court will deny Mountain State's motion for summary judgment as it relates to iconic devices.

An ambiguity exists with regard to the reimbursement amount Mountain State owed to Clear for Clear's sales of iconic devices that preceded the APA. The beginning of the "Iconic Order Agreement" indicates that: "it is agreed that the sale, expense and profit of the sale of [iconic devices] will remain in favor of Clear…." However, in the following "process" section for iconic devices, Step 7 of the process provides: "[a]ll gross profit from all iconic sales will be paid to Seller, less chargebacks and yet to be activated equipment charges…."

The first provision indicates Clear is entitled to full commissions, in this case, approximately $31.800.00. However, the second provision indicates Clear is entitled to only gross profit of the iconic devices, in this case, $2,652.27. Both interpretations are reasonable, and the contract and the record are silent as to which calculation the parties agreed upon. Accordingly, the Court will deny Mountain State's summary judgment on this claim.

## CONCLUSION

For the reasons articulated above, the Court finds Mountain State did not breach the VAA and did not breach the APA when it offset Verizon Chargebacks from its June 1, 2015 payment to Clear. As such, with regard to these claims, Mountain State's motion for summary judgment will be granted and Clear's motion for partial summary judgment will be denied.

Further, the Court finds Mountain State breached the APA when it deducted its inventory reconciliation from the June 1, 2015 installment purchase payment, as the APA did not clearly permit such a deduction. Mountain State also breached the APA when it failed to make a separate payment for iconic devices. However, genuine issues of material fact exist with regard to damages. Therefore, with regard to these claims, the Court will deny Mountain State's motion for summary judgment and will grant in part and deny in part Clear's partial motion for summary judgment accordingly.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1) Defendants Motion for Summary Judgment (Dkt. 21) is **GRANTED in part and DENIED in part**.

2) Plaintiff's Motion for Partial Summary Judgment (Dkt. 22) is **GRANTED in part and DENIED in part**.

Dated: **May 12, 2017**

Honorable Candy W. Dale
United States Magistrate Judge